UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MATERIALS MANAGEMENT
SOLUTIONS, LLC,

                    Plaintiff,

                                              Case No. 08-CV-10688

vs.                                              HON. GEORGE CARAM STEEH

CARRIER CORPORATION,

                    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

      This breach of contract lawsuit arises out of defendant Carrier Corporation's (Carrier's) early termination of a long term contract and its lump sum payment for the right to do so as required under the contract. Plaintiff Materials Management Solutions (MMS) contends the termination payment was insufficient to cover its unamortized costs associated with its investment in capital and start-up costs. MMS filed a two-count complaint. Count One alleges breach of contract and Count Two alleges that Carrier took an improper offset for damaged goods because the coils allegedly were not in MMS's possession when the damage occurred. Now before the Court is Carrier's motion for partial summary judgment as to Count One only, and MMS's cross-motion for summary judgment. For the reasons stated below, Carrier's motion shall be granted and MMS's cross-motion for summary judgment shall be denied.

## BACKGROUND

Carrier is a manufacturer of air conditioning and air handling equipment. In November, 2004, Carrier and MMS entered into a long term agreement by which MMS was to provide Carrier with warehousing, packaging, shipping, inventory control and logistical services for use for Carrier's compressors, coils and economizers. In connection with the agreement, MMS incurred significant capital expenditures including, among other things, securing a warehouse facility, securing lift trucks, tractors, trailers, pallet racking, and hoists. The agreement provided for termination on November 5, 2009, but allowed for early termination upon the requirement that Carrier make a lump sum payment. Specifically, Article VIII of the agreement provides, in relevant part:

> In the event the Agreement is terminated for any reason other than Supplier's [MMS's] default, Buyer [Carrier] agrees to reimburse Supplier [MMS] for the unamortized costs associated with Supplier's [MMS's] investment in capital and start-up costs as detailed in Appendix C. The amortization schedule is contained in Appendix C, including the formula for determining a lump sum payment in the event the Agreement is terminated for reasons other than Supplier's [MMS's] default. The lump sum payment as determined under the formula in Appendix C is Supplier's [MMS's] sole remedy against Buyer [Carrier] in the event of a default under this Agreement by Buyer [Carrier], and Buyer [Carrier] shall not be otherwise liable to Supplier [MMS] for any special, consequential or non-economic damages.

(Doc. 20, Exhibit 2 at 4). According to MMS, the purpose of Article VIII was to assure that MMS would be reimbursed for the unamortized portion of start-up costs and capital expenditures that it incurred in preparing to perform. On November 30, 2007, Carrier sent notice to MMS that it was terminating the contract effective January 1, 2008. It is not disputed that Carrier terminated the contract because it found a new supplier to perform the services at a reduced price and not because of any breach by MMS.

The parties agree that the lump sum payment is to be calculated according to Appendix C of the agreement but they disagree as to the interpretation of Appendix C. MMS contends, and Carrier vehemently disagrees, that Appendix C of the agreement contemplates that Carrier make regular monthly payments in the amount of $192,000 to MMS in payment for MMS's services under the contract. It is not disputed that Carrier made payments of only about $108,000 per month to MMS under the contract. MMS asserts that Carrier owes $1,242,911.23 for its early termination of the contract, while Carrier asserts that it owes $582,742 less an offset for allegedly damaged coils in the amount of $44,694.09, for a total of $538,047.91. MMS acknowledges that Carrier paid $538,047.91 to MMS when it terminated the contract. (Complaint, ¶ 14). The parties' dispute boils down to a disagreement over the meaning of Article VIII and Appendix C. Carrier argues that it correctly calculated the lump sum payment owing according to Appendix C. MMS, on the other hand, argues that Carrier improperly calculated the amount owing under Appendix C as it did not apply the correct formula.

Appendix C is a table which shows the amortization of MSS's start-up costs over a five year span which coincides with the anticipated life of the contract. It is titled, "Simple Loan Calculator." It states that the loan amount is $1,448,422 (MMS claims this is what it incurred in start-up costs and capital), that the interest rate is eight percent, that the loan is for five years, and that the start date of the loan is October 11, 2004. It then states that the monthly payment is $29,368.78, the number of payments is 60, total interest is $313,704.53, and the total cost of the loan is $1,762,126.53. Appendix C includes a table reflecting a payment date for each month, showing a beginning balance of the amount due on the loan, a payment of $29,368.78 for each month, breaking that

number down into principal and interest, and then showing an ending balance of what is due on the loan. MMS argues that the monthly payment of $29,368.78 shown in Appendix C was included merely as an example to demonstrate how start-up costs and capital could be amortized, and was not meant to be taken literally. In support of this claim, MMS relies on the affidavits of Barry Griesinger, 40 percent owner of MMS who was MMS's main negotiator and signed the contract, (Doc. 23, Exhibit 1) and of John Summers, a former Director of Material Logistics at Carrier, from 2002 to 2005, who participated in negotiations on behalf of Carrier (Doc. 23, Exhibit 2), although he did not sign the agreement himself. MMS also relies on the affidavit of Timothy Peck, a former Senior Purchasing Analyst of Carrier, (Doc. 30, Exhibit 1), from March, 2003 to March, 2005, who also negotiated the agreement on behalf of Carrier, although he was not a signatory on the contract either.

Carrier argues that Appendix C itself is the formula and there is no need to look outside the four corners of the document to interpret it. MMS claims that there was a significant deficiency between forecasted sales ($192,000 per month) and actual sales ($108,000 per month) which resulted in a shortfall in the overall amortization of MMS's start-up costs. Carrier claims this discrepancy is irrelevant as the Agreement specifically states that Carrier did not guarantee sales volumes. Specifically, Article IIa. provides, in relevant part,"[t]he forecasts are for planning purposes only, and Buyer [Carrier] is not obligated to meet the volumes outlined in the forecast." Article IIa goes on to provide that if the forecasts vary by more than 10 percent, the parties may renegotiate the price. Specifically, Article IIa provides, "[i]n the event the volumes increase or decrease 10% from the forecasted volume for any given year, the prices in

4

the following year may be adjusted based on the mutual agreement of the parties."

Moreover, Carrier argues that nothing in the contract requires that $192,000 a month in revenue is necessary to result in $29,367.78 being applied to the amortization. Carrier asserts that if MMS required $192,000 a month in order to allocate $29,367.78 to amortize its start-up costs, MMS should have requested such a provision in the contract. Moreover, Carrier points out that MMS does not dispute that Carrier paid at least $100,000 per month during the life of the agreement, totaling nearly $5 million, substantially in excess of the $1.4 million in purported start-up costs.

In support of its claim that the contract anticipated a general amortization of start-up costs and capital, MMS points to Appendix B, Assumption 4 which provides for the amortization of economizers only.[1] In Assumption 4, Carrier agreed to reimburse MMS if the container amortization was not completed because of low volume and MMS agreed to a reduced price once the amortization of the containers was completed. Carrier claims Assumption 4 has nothing to do with the general amortization being claimed by MMS. Carrier further argues that Assumption 4 reveals that the parties were capable of including specific amortization principles within the agreement.

Carrier argues that the plain language of the contract must control without reference to any evidence taken outside the four corners of the document because the

---

[1] Assumption 4 states:
Economizer price includes $7.71 per large economizer (for the first 17682) and $7.57 per small economizer (for the first 17894) to cover the costs of new returnable containers. The sequence price for large and small economizers will decrease to $15.94 per small economizer and $21.04 per large economizer once the amortization of the containers is complete. Should economizer volumes not be realized, buyer [Carrier] will reimburse supplier [MMS] for the remaining balance.

agreement includes a merger clause providing, "[t]his writing and the attached provisions and addendums constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior agreements, understandings, and representations." (Doc. 20, Exhibit 2, Article XI).

MMS spends a substantial portion of their brief explaining the negotiations prior to the consummation of the Agreement in dispute. Carrier argues that these facts are irrelevant as the contract speaks for itself. According to MMS, the parties understood that Carrier would be responsible for bearing all of MMS's start up costs such as securing a warehouse, purchasing racks, hoists, lift trucks and other equipment, as is allegedly common in the industry. In support of this claim, MMS relies on the affidavits of Griesinger and Summers. MMS also claims that e-mails between Griesigner and Summers show that Carrier agreed to be responsible for MMS's start up costs and capital in the aggregate amount of $1,448,422. According to the affidavits of Griesinger and Summers, MMS and Carrier both understood that MMS would be paid its actual unamortized portion of start-up costs and capital in the event that Carrier terminated the contract for convenience.

MMS further argues that Appendix C is based on the assumption that Carrier paid the forecasted amount of $192,000 per month, thus it would have been credited the full $29,368.78 per month towards amortization of MMS' costs under Appendix C. According to MMS, the $192,000 figure comes from Appendix B's forecasted annual sales in the amount of $2,309,000. Griesinger attests in his affidavit that while negotiating the Agreement, he created an amortization schedule to show how the amortization of the $1,448,422 would occur if Carrier reached its projected sales of

6

$192,000 and his table was later included as Appendix C. MMS argues that where Carrier paid less than the $192,000 benchmark, it would not be credited $29,368.78 but would have been credited with something less than that amount. Although MMS recognizes that the $192,000 forecast was not an enforceable promise, it alleges that the figure provided the basis for calculating the lump sum payment due under Appendix C.

Carrier responds that nothing in the contract supports the $192,000 benchmark to result in $29,367.78 being applied to the amortization. Carrier contends that if MMS wanted to require $192,000 a month in order to allocate the $29,367.78 to amortize start-up costs, it should have included such a provision in the contract. Carrier also asserts that MMS could have requested a provision allowing a set percentage of revenue to be applied towards amortizing the costs but it did not. Carrier asserts that Appendix C provides a chart for determining the lump sum payment due by referencing the date of termination, which it claims was the true unknown at the time the parties agreed to the contract.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored

7

procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-

movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

ANALYSIS

The parties agree that their contract is governed by Connecticut law under Provision 1 of their agreement. The parties also rely on some of the same case authority. Under Connecticut law, a "contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Allstate Life Ins. Co. v. BFA Ltd. P'ship, 287 Conn. 307, 313 (2008) (citing Alstom Power, INc. v. Balcke-Durr, Inc., 269 Conn. 599, 610-11 (2004)). "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." Id. "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." Id. A presumption that the language used in the contract is definitive arises where the contract is between sophisticated parties and is commercial in nature. Id. Where, as here, there is a merger clause, the Court "is forbidden from considering extrinsic evidence on the matter unless there was unequal bargaining power between the parties." Benevuti Oil Co. v. Foss Consultants, Inc., 64 Conn. App. 723, 728 (2001) (citations omitted).

The parol evidence rule bars the Court from considering extrinsic evidence to vary or contradict the terms of the written agreement where the parties have both consented to the complete and accurate integration of their agreement into a written contract. 3 Corbin, Contracts § 573. By contrast, where a contract is ambiguous, parole evidence may be used to flesh out the terms of the written agreement. In construing a contract, the Court is to "interpret contract language in accordance with a

fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Santana v. Hartford, 94 Conn. App. 445, 463 (2006) (citations and quotations omitted), aff'd, 282 Conn. 19 (2007). "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." Id. (quotations and citations omitted).

Article II of the parties' written agreement specifically provides that Carrier is not required to meet any forecasted sales volume. Article IIa states, in relevant part:

> A fee amount by commodity is detailed in Appendix B. The fee arrangement in Appendix B is based upon the forecasted annual volumes outlined in Appendix B remaining within a band of +/- 10%. The forecasts are for planning purposes only, and Buyer [Carrier] is not obligated to meet the volumes outlined in the forecast.

(Doc. 20, Exhibit 2 at 1). Although Appendix B forecasts that the total annual volume for all commodities was expected to amount to $2,309,000 per year or $192,000 per month, nowhere in the contract is Carrier required to meet any specific quantity requirement. Moreover, nothing about the pricing forecasts set forth in Appendix B references Appendix C. Because the contract specifically authorized the parties to renegotiate pricing if the volume quantity was less than expected, the contract provided MMS with a remedy to ensure that it would receive enough revenue to satisfy its internal amortization obligations.

Article VIII of the contract provides that Carrier may terminate the contract for any reason, but must pay a lump sum penalty for its right to do so. Specifically, Article VIII provides:

> In the event the Agreement is terminated for any reason
> other than Supplier's [MMS's] default, Buyer [Carrier] agrees
> to reimburse Supplier [MMS] for the unamortized costs
> associated with Supplier's [MMS's] investment in capital and
> start-up costs as detailed in Appendix C. The amortization
> schedule is contained in Appendix C, including the formula
> for determining a lump sum payment in the event the
> Agreement is terminated for reasons other than Supplier's
> [MMS's] default. The lump sum payment as determined
> under the formula in Appendix C is Supplier's [MMS's] sole
> remedy against Buyer [Carrier] in the event of a default
> under this Agreement by Buyer [Carrier], and Buyer [Carrier]
> shall not be otherwise liable to Supplier for any special,
> consequential or non-economic damages.

(Doc. 20, Exhibit 2 at 4). Article VIII is clear that MMS's sole remedy against Carrier is the payment owing as calculated in Appendix C. MMS admits as much. But the parties dispute the interpretation of Appendix C.

Carrier paid the amount owing under a literal reading of the table set forth in Appendix C. Appendix C sets forth a chart or table that specified a "lump sum payment" that would gradually reduce over the expected life of the agreement, beginning with the $1,448,422, and ending at zero five years later. MMS asserts that although Appendix C shows $1,448,422 amortizing each month with $29,368.78 in payments, this was included only as an "example" to demonstrate how start-up costs and capital "could" be amortized, and is not to be taken "literally or verbatim." Given this argument, it is clear that MMS is seeking to use parol evidence to vary and to contradict the plain language of Appendix C. The parol evidence rule clearly bars such an exercise here where there is no ambiguity in Article VIII and Appendix C.

In its response brief, Carrier perceptively observes that under MMS's theory Appendix C would be rendered meaningless. As Carrier correctly notes, Article VIII

11

plainly states that the "lump sum payment" will be "determined under the formula in Appendix C." MMS contends that a formula can be extracted from Appendix C by incorporating an assumption that Carrier make sales payments of exactly $192,000 per month. Carrier correctly points out that Appendix C is itself the formula. Carrier correctly followed the table set forth in Appendix C and paid the "lump sum payment" shown there to be owing. MMS's construction of Appendix C defies logic and is not a reasonable interpretation of the contract. Under MMS's theory, Appendix C is only relevant to the extent that it sets forth actual start-up costs of $1,448,422 and the interest rate of 8 percent and then left MMS to unilaterally decide how much of its revenue it could attribute towards satisfying the amortization of its start-up costs. Worse than that, at oral argument, MMS's counsel suggested that even the interest rate of 8 percent was also variable and could be a floating rate. Such a construction would leave this Court in the impossible position of rewriting the contract where all of its essential terms remain undefined.

MMS contends that the amortization table set forth in Appendix C relied on a hypothetical sales volume of $192,000 per month but nothing so states in Appendix C itself, or any other provision of the contract. MMS relies on the affidavits of Griesinger, Summers, and Peck for the proposition that the purpose of Article VIII and Appendix C was to assure that MMS would be reimbursed for the unamortized portion of start-up costs and capital expenditures it incurred in preparing to perform. It contends that the deficiency between forecasted sales and actual sales results in a shortfall in the overall amortization of MMS's start-up costs. According to MMS, the payment figures in Appendix C, which show a monthly payment of $29,368.78 per month toward the

12

amortization of MMS's start-up costs and capital investments may only be credited if Carrier actually met the forecasted amount of $192,000 in monthly sales. Conversely, MMS argues that if Carrier exceeded $192,000 in sales for a given month, than it would be credited with something more than $29,368.78. Once again, such a construction is inconsistent with the plain language of Article VIII and Appendix C.

The parties appear to agree that Carrier's payment obligations to MMS were set forth in Article II which incorporated Appendix B by reference. Appendix B sets forth the only specific amortization cost that Carrier was obligated to pay to MMS during the life of the contract, namely, the amortization of economizers for which the price would decrease once the amortization was complete. (Doc. 20, Exhibit 2 at Appendix B). That specific amortization was built into the payment structure on a per commodity basis. Nowhere else in the contract was Carrier required to make any amortization payments to MMS. MMS argues that since the contract provided for a decrease in price of the economizers once the amortization for those commodities was complete, this translates into a finding that the annual forecasted volume for all commodities was expected to amount to $2,309,000 or $192,000 per month. Nothing in the contract language itself supports this construction.

MMS seeks to rely on pre-contract negotiations between Summers and Greisinger, as expressed in an e-mail exchange, for the proposition that Carrier gave MMS a "blank check" for its start-up costs and capital expenditures, promising to be responsible for all those costs. (Doc. 23 at 15-16, Exhibit 4). Carrier responds that such alleged negotiations, if they in fact took place, did not become part of the written contract and cannot now be used to vary the explicit terms of the agreement, which

contains a merger clause. There is no dispute that the contract contains a merger clause which provides "[t]his writing and the attached provisions and addendums constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior agreements, understandings, and representations." (Doc. 20, Exhibit 2, Article XI). Given the merger clause and the parol evidence rule, in the presence of the clear language of Article VIII, the Court will not delve into the various claims concerning the negotiating positions of the parties leading up to the execution of the agreement.

Finally, MMS complains that Carrier's motion for summary judgment should be denied because Carrier has refused to cooperate in discovery. Carrier has taken the position that no discovery is warranted until its motion for summary judgment here is resolved as it seeks to prevail solely on the basis of the written agreement itself. Carrier's argument is well taken as discovery is not needed for this Court to interpret the four corners of the contract given the unambiguous terms of Article VIII. Thus, MMS's opposition to Carrier's motion for partial summary judgment and its own cross-motion for summary judgment shall be denied on this basis as well.

## CONCLUSION

Based on the unambiguous terms set forth in Article VIII and Appendix C of the parties' written agreement, Carrier's motion for partial summary judgment as to Count One only (Doc. 20) hereby is GRANTED and MMS's cross-motion for summary

judgment (Doc. 23) hereby is DENIED.

SO ORDERED.

Dated: December 17, 2008

s/George Caram Steeh  
GEORGE CARAM STEEH  
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on December 17, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk